## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BLUEFIELD

JASON B. TARTT,
DONNIE HAIRSTON,
VENTRISS HAIRSTON,

                              Plaintiffs,

vs.                                                    Civil Action No. 1:22-cv-00327


DALTON T. MARTIN, individually
JORDAN A. HORN, individually,
JAMES "BOOMER" MUNCY, individually,
MCDOWELL COUNTY COMMISSION, a
West Virginia Political Subdivision,


                              Defendants.

### **FIRST AMENDED COMPLAINT**

This complaint, brought pursuant to 42 U.S.C. Section 1983, 1985, the Fourth,

Fourteenth and First Amendments to the United States Constitution, arises out of the defendant's

commission of federal constitutional violations committed against the plaintiffs in McDowell

County, West Virginia, on or about August 7, 2020, within the Bluefield Division of the Southern

District of West Virginia.

### INTRODUCTION

1.      On August 7, 2020, the three plaintiffs, all African Americans, were the victims of

unlawful and outrageous racial profiling, harassment and retaliation by the two defendant police

officers, employed by the McDowell County Sheriff's Office.

2.      Based on nothing other than the plaintiffs' skin color, Donnie and Ventriss Hairston were accused of growing four marijuana plants located in overgrown brush at a nearby property owned by a third party. They called their landlord, who walked over from his adjacent residence. When the plaintiffs expressed criticism of their treatment by the officers, occurring on their own front porch, and asked for the names of the two officers for their own protection, the two defendant officers engaged in an egregious abuse of authority by retaliating against them, harassing them, physically forcing the Hairstons inside the front door of their home, preventing them from witnessing and recording the misconduct being perpetrated by the defendant officers.

3.      After Plaintiff Jason Tartt, a former Military Policeman, questioned the authority of the officers to engage in the unlawful racial profiling and mistreatment of himself and his tenants, the defendant officers engaged in unlawful retaliation against Mr. Tartt, including a false arrest and incarceration. The charge was later dismissed.

## JURISDICTION

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1331 and 1343.

## PARTIES

5.      Plaintiff Jason Tartt was at all times relevant hereto a resident of McDowell County, West Virginia.

6.      Plaintiffs Donnie and Ventriss Hairston are husband and wife and were at all times relevant hereto residents of McDowell County, West Virginia.

7.      Defendant police officer Dalton T. Martin, was at all times relevant hereto a sworn police officer employed by the McDowell County Sheriff's Office, and was at all times

relevant hereto acting under color of law. He is named herein in his individual capacity, having an address of 350 Virginia Ave Suite 101, Welch, West Virginia 24801.

8.      Defendant police officer Jordan A. Horn, was at all times relevant hereto a sworn police officer employed by the McDowell County Sheriff's Office, and was at all times relevant hereto acting under color of law. He is named herein in his individual capacity, having an address of 350 Virginia Ave Suite 101, Welch, West Virginia 24801.

9.      Defendant police officer James "Boomer" Muncy, was at all times relevant hereto serving in a supervisory capacity in the McDowell County Sheriff's Office, previously being Chief Deputy, and thereafter serving as Sheriff, and was at all times relevant hereto acting under color of law. He is named herein in his individual capacity, having an address of 350 Virginia Ave Suite 101, Welch, West Virginia 24801.

10.     Defendant McDowell County Commission ("MCC") is a political subdivision of the State of West Virginia. See West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29-12A-1, et seq.

**FACTS**

11.     On, or about, August 7, 2020, the defendant police officers, Dalton T. Martin and Jordan A. Horn, both sworn deputies employed by the McDowell County Sheriff's Office, arrived to the residence owned by Jason Tartt, which was leased to Donnie and Ventriss Hairston. They claimed that they received a complaint "for a marijuana grow in the area" of Baptist Drive.

12.     Deputy Martin wrote in his police report narrative that, "*Upon our arrival we incountered [sic] by two elderly subjects who was [sic] on the porch and asked them if they growed [sic] marijuana and they stated "No*".

3

13.     For some reason, however, instead of moving on, the defendant police officers began to intimidate and upset the Hairstons. The Hairstons were shocked at their treatment by the defendant police officers. They were on the porch of their home when they saw police officers approach up the small road leading towards the house. They initially waved at Defendant Dalton as he approached. However, as he neared, Dalton appeared to be agitated and angry. Without providing any context, or asking any other questions, Dalton immediately asked the Hairstons if they were growing marijuana. They responded in shock, disbelief and confusion that, no, of course they weren't growing marijuana.

14.     The Hairstons had just moved into the home in June of 2020. Mr. Hairston was 66 years of age and Mrs. Hairston was 63 years of age on the date of the incident. They moved to McDowell County from Lynchburg, Virginia after retiring. Both grew up just a few miles down the road from the incident location. They have no criminal record. There has never been any indication or evidence that the Hairstons have ever grown marijuana.

15.     Jason Tartt, the Hairstons' landlord, is a military veteran who served in the Military Police. He later served as Vice President for a Department of Defense contractor, and like the Hairstons, also ended up returning to his hometown community. Mr. Tartt is a local entrepreneur who has been focused on giving back to his community, helping to create an economic entrepreneurship program in a region which suffers from extreme poverty and lack of essential services and products. He works with youth in the community to help educate them and train them in economic opportunity and entrepreneurship. He had no criminal history whatsoever prior to encountering the defendant police officers on August 7, 2020.

4

16.     On August 7, Mr. Tartt received a phone call from his tenants, the Hairstons, informing him that the defendant police officers had arrived on the properties owned by him, and were walking around, looking through windows and had accused the Hairstons of growing marijuana. The Hairstons felt afraid of the officers, who were not being friendly and who wouldn't leave them alone, even though they were on their own front porch.

17.     Tartt walked from his residence to the Hairston residence. As he had not planned to go anywhere, he was wearing sliders and casual clothing. He did not have identification on him at the time.

18.     After Mr. Tartt's arrival, he walked onto the front porch of the home with the Hairstons and began to listen to the conversation between Dalton and Mrs. Hairston. Dalton asked for his name, and Mr. Tartt replied, "Jason Tartt."

19.     It became apparent to the plaintiffs that Defendant Dalton had no legitimate reason to be angry with them, or to suspect that they had anything to do with marijuana plants growing in overgrown brush on a different property in the woods, well beyond the curtilage of their home, as well as the property boundaries. They began to suspect that  they were the victims of unlawful racial profiling and multiple civil rights violations. Being in a rural area with a history of police misconduct and official corruption, they began to suspect that they may be in danger. To whatever extent the Hairstons implicitly licensed the initial presence of the officers on the property by waving at them, that license was thereafter revoked through express and implicit communications, as a result of the officers' behavior.

20.     As captured on body cam footage, Mrs. Hairston expressed her concern to Defendant Dalton that she was scared of him, expressing criticism of Defendant Dalton's actions

and his demeanor. Mrs. Hairston stated that, "*in the season we're living in*,"[1] that she would feel safe if she could know the officers' names. At one point Defendant Dalton mockingly said, "*I'll see if I can find my name*," all the while refusing to give his name.

21.    Jason Tartt, still standing on the front porch with the Hairstons, and speaking to the officers, who were standing in the driveway, asked Defendant Dalton, if they were concerned about the house next door to the Hairstons, which stood in between the woods where the marijuana was found, and the Hairston home. Dalton replied, "*yes*." Tartt and Mrs. Hairston then explained that an elderly gentleman lives there, and that he may be home if he wants to go talk with him.

22.    Defendant Dalton became even more angry. He asked Tartt for his name, which Mr. Tartt calmly and politely provided. Dalton then turned his anger on Mr. Tartt, asking, "*What do you mean by the 'season we're living in*?'" He also became highly agitated at Mrs. Hairston telling him that she was scared of him. Ironically, he aggressively argued with Mrs. Hairston about whether she should be scared as a result of his actions.

23.    Mr. Tartt asked Defendant Dalton, again calmly and politely, "*What do you need… Do you have any questions for me*?" As the property owner, Mr. Tartt explicitly and implicitly communicated to the officers that they were not welcome on the property, as they were scaring his tenants.

---

[1] Mrs. Hairston was clearly referring to the national proliferation of incidents of police misconduct - especially those involving white police officers and African American victims, such as the George Floyd and Breonna Taylor incidents, among many others.

24.     Defendant Dalton, who was already aware of Jason Tartt's name, said "*Nah, I'll collect some information from you - your name, date of birth and such*." Defendant Dalton now had decided to retaliate against the Plaintiffs for expressing criticism and fear of the officers.

25.     Being a former Military Police officer, Mr. Tartt knew that he was being victimized and retaliated against by Defendant Dalton.

26.     While standing on the front porch of the Hairston home, owned by him, Mr. Tartt calmly and politely asked, "What do you need my information for?" Dalton responded, "You own these two homes, correct?" During this conversation, the officers were standing well inside the curtilage of the Hairston residence, standing several steps away from the home's front porch, on which the plaintiffs were all located. Whatever implied license the officers may have had to be present on the said private property had clearly been revoked by this point. However, the officers remained and continued their investigation on the subject private property. They possessed no probable cause and warrant, nor exigent circumstances to remain on the property.

27.     Mr. Tartt replied, "*What do these two homes got to do with . . .*" which was interrupted by Dalton saying, "*These two homes is near that marijuana grow, so I'd just like to have your name*." Of course, Dalton already had Tartt's name, but now intended to harass and retaliate against Mr. Tartt. In reality, the Hairston home was nowhere near the marijuana plants found by Dalton. Indeed, there was another house, as well as a derelict church, in between the two locations. The marijuana was not found on property owned by Mr. Tartt, of which the defendant officers were aware.

28.     Mr. Tartt, who had already provided his name, expressed that he didn't feel comfortable giving his date of birth to Dalton. Tartt was still standing on the front porch of the

Hairston home at this time, with Dalton and Horn standing in the driveway, on Mr. Tartt's property.

29.     Defendant Dalton had no reason to need Mr. Tartt's date of birth, other than to engage in unlawful harassment and retaliation of Mr. Tartt and the Hairstons. Nor did he have probable cause and a warrant. Dalton knew that the four marijuana plants he found were not located on any property owned by Mr. Tartt. Moreover, he didn't even know who Mr. Tartt was until he walked over to the Hairston home and introduced himself. Only after the plaintiffs criticized Defendant Dalton did Dalton claim to need Mr. Tartt's date of birth. At no point did Dalton ever inquire as to the Hairstons' dates of birth - nor the 79 year old tenant of Mr. Tartt's who lived even closer to where the four marijuana plants were found.

30.     To the shock of the plaintiffs - especially the Hairstons - Defendant Dalton then walked, uninvited, onto the home's attached front porch and physically seized Mr. Tartt, forcibly removing him off the front porch and taking him onto the driveway, both using physical force and through verbal intimidation and threats of violence.

31.     As Donnie and Ventriss Hairston attempted to video and witness what was happening, Defendant Dalton physically forced them to stop and to go inside their home. While standing on the Hairstons' front porch, Defendant Dalton physically placed his hands on Mr. Hairston and pushed him inside his own front door, closing the door behind him. Martin's body cam footage clearly shows Martin's arm entering the Hairston home as he pushed Mr. Hairston inside the house. At the time, Dalton was standing on the home's attached front porch, uninvited and clearly without the consent of any of the plaintiffs.

8

32.     Dalton and Horn then placed Mr. Tartt in handcuffs and placed him in the cruiser. He was driven to Welch for processing and subsequent incarceration. On the way there, Defendant Martin communicated to his superiors several times the details of what he had just done.

33.     Dalton charged Jason Tartt with obstruction under WV Code § 61-5-17(a).

34.     On October 28, 2020, a Criminal Judgment Order was issued by the Magistrate Court of McDowell County, dismissing the obstruction charge. As the reason for the dismissal, the order indicates, "*Dismissed by [Prosecuting Attorney], Officer failed to appear to prosecute*."

<u>COUNT ONE - UNREASONABLE SEIZURE UNDER 42 U.S.C. 1983</u>
<u>VIOLATION OF THE FOURTH AMENDMENT</u>
**(False Warrantless Arrest of Jason Tartt)**

35.     The previous paragraphs are hereby incorporated by reference as though fully restated herein.

36.     On August 7, 2020, the Individual Officers, acting under color of law, jointly participated in, and effected, the warrantless arrest of Plaintiff Jason Tartt for the alleged crime of obstruction under WV Code § 61-5-17(a).

37.     The Defendant Individual Officers seized the Plaintiff (Jason Tartt) and arrested him without a warrant and knowingly did so without probable cause to believe that Plaintiff had committed the crime for which he was charged, or any other criminal offense.

38.     Even had the Defendant Individual Officers possessed probable cause to believe Plaintiff had committed a crime that could subject him to a warrantless arrest in a public place, Jason Tartt was not in a public place, but rather was lawfully located on the front porch of a private residence, within the curtilage and protected area of that residence. Specifically, Mr. Tartt

9

was located on the front porch of the private residence occupied by Plaintiffs Donnie and

Ventriss Hairston, owned by Mr. Tartt. He was at the residence at the request and permission of

the Hairstons.

39.     In order to lawfully effectuate a warrantless arrest in a home, rather than a public

place, absent consent or exigent circumstances, police officers must have a warrant. <u>Payton v.</u>

<u>New York</u>, 445 U.S. 573 (1980) (voiding state law authorizing police to enter private residence

without a warrant to make an arrest).

40.     Supreme Court jurisprudence extends heightened Fourth Amendment protections

beyond just the interior of the home itself, but also to the "curtilage," which is the "land

immediately surrounding and associated with the home," because the curtilage is "considered

part of the home itself for Fourth Amendment purposes." <u>Oliver v. United States</u>, 466 U.S. 170,

180 (1984). The Fourth Circuit has made clear that a warrantless search of curtilage is presumed

to be unreasonable. <u>Covey v. Assessor of Ohio Cnty.</u>, 777 F.3d 186 (4th Cir. 2015).

41.     Applying the trespass-based analytical framework, the Supreme Court has

determined that a search "undoubtedly occur[s]" when the government, without a warrant,

obtains information "by physically intruding" within the curtilage of a house. <u>Florida v. Jardines</u>,

569 U.S. 1, 6 (2013). Thus, a search occurs occurs unless a homeowner has explicitly or

implicitly sanctioned the government's physical intrusion into the constitutionally protected area.

<u>Id</u>.

42.     The Fourth Circuit made clear as early as 2001 that police officers will not be

entitled to qualified immunity for failing to comprehend that police officers have no right to enter

upon curtilage to make an investigation based on reasonable suspicion, but rather are limited to

engaging in a "knock and talk." <u>Rogers v. Pendleton</u>, 249 F.3d 279, 289 (4th Cir. 2001).

Additionally, the Court made clear that "searches of the curtilage require probable cause even

without regard to the law of trespass." <u>Id</u>; citing <u>United States v. Jackson</u>, 585 F.2d 653, 660 (4th

Cir. 1978) ("Of course, a search of one's home or its curtilage, effected as a result of a trespass, is

an encroachment on a person's expectancy of privacy and is for that reason, but not because of

the trespass, a violation of the Fourth Amendment if not based on probable cause or authorized

by a search warrant.").

43.     Under the "knock and talk" exception to the warrant requirement, a police officer

not armed with a warrant may approach a home and knock, precisely because that is "no more

than any private citizen might do." <u>Covey v. Assessor of Ohio Cnty.</u>, 777 F.3d 186 (4th Cir.

2015) (citing <u>Jardines</u>, 133 S.Ct. at 1416). This means there is an "implicit license . . . to

approach the home by the front path, knock promptly, wait briefly to be received, and then

(absent invitation to linger longer) leave." <u>Id</u>. An officer may also bypass the front door (or

another entry point usually used by visitors) when circumstances reasonably indicate that the

officer might find the homeowner elsewhere on the property. <u>Id</u> (citing <u>Pena v. Porter</u>, 316

Fed.Appx. 303, 313 (4th Cir. 2009). "Critically, however, the right to knock and talk does not

entail a right to conduct a general investigation of the home's curtilage." <u>Id</u>. (citing <u>Rogers</u>, 249

F.3d at 289).

44.     The Individual Defendant Officers were captured on their own body cam footage,

conducting a general search of the curtilage of the Hairston home, as well as the home next door,

also owned by Jason Tartt. They did so despite being told by the homeowners that they were

afraid of the officers and were upset by their presence, as described above. The officers had no

probable cause. Nor did they have a warrant or exigent circumstances to lawfully exceed the bounds of a "knock and talk" activity.

45.     Plaintiffs had a clearly established right to be free from the Defendant Individual Officer's search and seizure with the curtilage of their private residence, absent probable cause plus either a warrant or exigent circumstances. Thus the search and seizure which the defendant officers performed was illegal based upon clearly established law at the time of the search. *See* Rogers, 249 F.3d at 290.

46.     Even had the subject incident occurred in a public place, the Individual Defendant Officers had no valid reasonable suspicion to support an investigatory detention of the plaintiffs. Dalton can be heard on body cam footage attempting to articulate reasonable suspicion to the plaintiffs, which was the basis for the warrantless arrest of Jason Tartt when he failed to provide his birth date. The alleged reasonable suspicion articulated by Dalton was his knowledge that Mr. Tartt owned property near where the officers found four alleged marijuana plants. Other than his appearance, no other information was known by the Defendant Officers about Jason Tartt that would give rise to any suspicion of Tartt engaging in criminal conduct.

47.     Even assuming the defendant officers did have valid reasonable suspicion to engage in an investigatory detention of Mr. Tartt, because the Individual Defendant Officers undisputedly lacked probable cause, along with a warrant or exigent circumstances, the Defendant Officers engaged in an illegal search and seizure through their actions of carrying out that investigation on August 7, 2020.

48.     At the time of the Plaintiff's arrest, the facts and circumstances within the defendants' joint knowledge, as well as those available to the Individual Officers, were not

sufficient to warrant a reasonably prudent police officer to believe that under the circumstances present at the time, that Plaintiff had violated any criminal statute or committed any criminal offense, nor that they were legally entitled to make such arrest, even with the presence of probable cause.

49.      Plaintiff suffered damages, for which he is entitled to recover.

### COUNT TWO - UNREASONABLE SEIZURE UNDER 42 U.S.C. 1983 VIOLATION OF THE FOURTH AMENDMENT
**(Malicious Prosecution)**

50.      The previous paragraphs are hereby incorporated by reference as though fully restated herein.

51.      In the recent Supreme Court opinion in Thompson v. Clark, 596 U.S. _____ (2022), the Court clarified the application of malicious prosecution claims under Section 1983. The Court held that a plaintiff in a Section 1983 malicious prosecution claim is not required to show that his criminal prosecution ended with an affirmative indication of his innocence. Rather, a plaintiff only needs to show "that his prosecution ended without a conviction."

52.      Plaintiff (Jason Tartt) was charged and prosecuted for the alleged crime of obstruction under WV Code § 61-5-17(a). This charge was filed with the Magistrate Court of McDowell County maliciously and for the improper purpose of retaliation in response to protected free speech, as well as for the improper purposes of harassment.

53.      Corroborating the fact that Defendant Dalton knew that the prosecution of Mr. Tartt was frivolous and malicious, he failed to even appear to prosecute the case. Dalton's goal wasn't conviction, which he knew would not occur in the absence of evidence of criminal wrongdoing, but rather to force Mr. Tartt to undergo the humiliating process of being arrested,

13

incarcerated and charged. Thus the actions of filing and maintaining a frivolous criminal prosecution of Mr. Tartt, under the circumstances described herein, consists of a standalone subsequent Fourth Amendment violation as an additional unreasonable search and seizure.

54.     Plaintiff suffered damages, for which he is entitled to recover.

<u>COUNT THREE - UNREASONABLE SEIZURE UNDER 42 U.S.C. 1983</u>
<u>VIOLATION OF THE FOURTH AMENDMENT</u>
**(Unreasonable Search and Seizure of the Hairstons)**

55.     The previous paragraphs are hereby incorporated by reference as though fully restated herein.

56.     Defendant Dalton entered the private property, curtilage, as well as the front porch of Mr. and Mrs. Hairston on August 7, 2020. He and Defendant Horn remained on the property against their will, engaged in a general search of the curtilage of the property, detaining them for an unreasonable amount of time, interrogating them against their will, making them feel scared and unsafe.

57.     Defendant Dalton and Horn confined the Hairstons, detaining them in the absence of probable cause and either a warrant or exigent circumstances, doing so at a time when the Defendant Officers were located inside the curtilage of the Hairstons' home, also intruding onto their front porch - even extending an arm inside the home's front door.

58.     Even if the Defendant Individual Officers possessed either reasonable suspicion or probable cause, for reasons which are alleged in Count One, above, the defendant officers had no right to engage in an investigatory detention, search, or seizure within the curtilage and front porch of the Hairstons' home, absent probable cause and either a warrant or exigent circumstances.

59.     The Hairstons clearly did not consent, either explicitly or implicitly, to the officers search and seizure herein. Instead, they expressed criticism and fear, clearly conveying that they did not consent to the presence of the defendant officers at their home on August 7, 2020. Any implied license authorizing the Defendant Officers to engage in a knock and talk activity was explicitly and implicitly revoked early in the encounter.

60.     Defendant Dalton subsequently forced the Hairstons off their own front porch, and into their home, forcibly shoving Mr. Hairston into his doorway, closing his front door behind him, preventing Mr. Hairston from filming the defendant officers' misconduct.

61.     At the time Defendant Dalton shoved Mr. Hairston into his doorway, Dalton was standing on the home's covered front porch, present against the will of the residents and owner of the property.

62.     At no time did the defendant officers have probable cause and a warrant to arrest or search or seize any person or property at the subject property.

63.     At no time did the defendant officers have valid consent to remain on the subject property during the events described above.

64.     At no time were the defendant officers presented with probable cause plus exigent circumstances justifying the invasion of the sanctity of the plaintiffs' home on August 7, 2020.

COUNT FOUR - RETALIATION UNDER 42 U.S.C. 1983
VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS
**(Against all Defendants by all Plaintiffs)**

65.     The previous paragraphs are hereby incorporated by reference as though fully restated herein.

66.     Plaintiffs actions on August 7, 2020 of expressing criticism and fear of the defendant police officers, as well as in invoking their civil rights, as described above in more detail, are safeguarded by the First Amendment to the United States Constitution.

67.     Using their respective authorities under color of state law, the Individual Defendants subjected plaintiffs to the deprivation of their rights under the First Amendment by retaliating against them for exercising those rights.

68.     Motivated to punish and intimidate the plaintiffs for their exercise of their free speech, the Individual Defendants engaged in various harmful acts against the plaintiffs in violation of clearly established First Amendment law, resulting in the Hairstons being forced into their home against their will, as well as Mr. Tartt's arrest. These acts include:

   a.     Remaining on private property against the will of the owner and residents, doing so for an unlawful and unreasonable period of time;

   b.     Interrogating the owner and tenants of the subject property against their will and without a warrant or any legal basis to do so, and doing so for an unlawful and unreasonable period of time;

   c.     Harassing and intimidating the plaintiffs, berating them, arguing with them and accusing them of being criminals, despite having absolutely no evidence or indication they engaged in any criminal conduct;

   d.     Repeatedly asking Jason Tartt for his name, despite already knowing his name, for the purposes of intimidating him and setting up a false arrest for obstruction;

   e.     Repeatedly asking Jason Tartt for his date of birth, for the purposes of

intimidating him, scaring him, invading his privacy, and setting up a false

arrest for obstruction;

f.  Generally treating the plaintiffs as if they are second-class citizens,

purposefully causing them emotional harm and fear;

g.  Engaging in the unlawful practice of racial profiling against the

plaintiffs.

69.  The foregoing actions are independently unconstitutional but also were intended

to send a warning to plaintiffs, or anyone else in the community bold enough to assert their rights

or criticize the defendants, by exercising their First Amendment rights in the future.

70.  It is clearly established that retaliating against individuals by arresting them under

a law that is generally not used to arrest similarly-situated individuals is a violation of the First

Amendment. Every reasonable government official would have had a fair warning that doing so

and participating in a scheme to do so is unconstitutional.

71.  It is furthermore clearly established that retaliating against individuals by

engaging in the various harmful acts described above is a violation of the First Amendment.

Every reasonable government official would have had a fair warning that doing so and

participating in a scheme to do so is unconstitutional.

72.  The facts also demonstrate that the criminal charge the Individual Defendants

assigned to Mr. Tartt was a sham charge, regardless of attempts to fabricate probable cause or

convince a magistrate to sign a criminal complaint. Thus, even if probable cause existed, the

application of an unenforced law to Mr. Tartt is insufficient to outweigh the retaliatory animus

illustrated by the surrounding circumstances. The facts cannot objectively justify Mr. Tartt's arrest.

73.     Even if state law compelled Mr. Tartt to disclose his date of birth under the circumstances, which it doesn't, other similarly situated individuals, such as Mr. Tartt, are not arrested for failure to provide date of birth while standing on the front porch of a home on private property.

74.     Moreover, there was no time-sensitive reason that the defendant officers immediately needed Mr. Tartt's date of birth, under circumstances where the plaintiffs were legally entitled to remove the officers from their property and to be left alone.

75.     Furthermore, plaintiffs' protected speech is not a legitimate consideration in determining whether to make the decision to demand an homeowner's date of birth as part of an investigation.

76.     The Individual Defendants' unconstitutional acts, motivated by retaliatory animus, directly harmed each of the plaintiffs by chilling their ability to exercise their First Amendment rights and by causing them pecuniary loss and emotional harm and distress.

77.     Had it not been for the retaliatory animus, the Individual Defendants would never have arrested Mr. Tartt on August 7, 2020.

COUNT FIVE - CONSPIRACY TO DEPRIVE
CIVIL RIGHTS UNDER 42 U.S.C. 1985
**(Individual Officers)**

78.     Plaintiff incorporates by reference all of the previous paragraphs.

79.     Defendants Martin and Horn, conspired for the purpose of depriving, either directly or indirectly, the plaintiffs of the equal protection of the laws of the United States and/or of the equal privileges and immunities under the laws of the United States.

80.     Plaintiffs are each African Americans. They were targeted as suspects in the defendant officers' marijuana plant investigation just by virtue of their being African Americans. Due to the color of plaintiffs' skin, the defendant officers engaged in the outrageous behavior of violating their privacy, private property rights, engaging in harassment, as more specifically described in the above paragraphs - despite the fact that he had no information indicating they had violated any law, and the fact that the officers had no right to interrogate them and obtain their private information in the sanctity of their own home and private property, much less to shove the Hairstons inside their home, prevent them from filming, and forcibly arrest Mr. Tartt.

81.     The defendant officers would not have engaged in this behavior, or treated the plaintiffs in this manner, but for the fact that they are African Americans. Defendant Dalton openly admitted on August 7, 2020 that he required Jason Tartt's full criminal history background check, before he could be eliminated as Dalton's potential criminal suspect. Mr. Tartt was treated as guilty, until proven otherwise, just based on his appearance. When Mr. Tartt chose to express criticism and assert his civil rights, he was met with retaliation and humiliation.

82.     In furtherance of the conspiracy, Plaintiff was arrested illegally by the two defendant police officers and transported for incarceration.

83.     Plaintiff suffered damages, for which he is entitled to recover pursuant to 42 U.S.C. 1985(c).

<u>COUNT SIX - MONELL CLAIM</u>
<u>UNDER 42 U.S.C. 1983</u>

84.     Plaintiff incorporates by reference all of the previous paragraphs.

85.     The Defendant Individual Officers deprived the plaintiffs of their constitutional rights as a result of the events of August 7, 2020, as described above in greater detail.

86.     The said constitutional deprivations directly resulted from either an official written policy of the McDowell County Commission ("MCC") through the McDowell County Sheriff's Office, or an unofficial custom. This includes, but is not limited to, the policy and practice of authorizing general searches of the curtilage of homes in the absence of probable cause and a warrant or exigent circumstances, as a matter of department procedure and policy, so as to result in the Individual Defendant Officers acting in accordance with that procedure and policy on August 7, 2020.

87.     The MCC immediately acquired knowledge of the actions of the Defendant Individual Officers, as described herein, as their actions were communicated to their supervisors via radio communications during the arrest and transport of Jason Tartt on August 7, 2020. Defendant Martin repeatedly described his actions over the radio during the transport.

88.     Upon information and belief, Defendant Martin was a supervisor over Defendant Horn, and was captured on body cam footage instructing Horn on engaging in said constitutional violations by showing him through field training.

89.     Upon information and belief, there are multiple prior similar incidents of MCC deputies engaging in similar constitutional violations, as occurred to the Plaintiffs on August 7, 2020.

90.     The MCC took no actions to stop the subsequent prosecution of Jason Tartt following his arrest. They furthermore took no actions to change their policy, or alter their supervision or training, so as to prevent future similar constitutional violations by their employees.

91.     The Defendant MCC acted under color of law.

92.     That, as a direct result, the Plaintiffs suffered damages, including constitutional injury.

## COUNT SEVEN - SUPERVISORY LIABILITY
## UNDER 42 U.S.C. 1983

93.     Plaintiff incorporates by reference all of the previous paragraphs.

94.     Defendant James "Boomer" Muncy was at all times a supervisor of the Defendant Individual Officers, previously in the capacity of Chief Deputy, and subsequently in the capacity of Sheriff of McDowell County.

95.     The Defendant Individual Officers violated the Plaintiffs' constitutional rights, as described in the above counts.

96.     Upon information and belief, the said supervisor had notice of a pattern of unconstitutional acts by his subordinates, as described above.

97.     Defendant Muncy's training practice and/ or supervision was inadequate in regards to the said unconstitutional acts.

98.     Defendant Muncy was deliberately indifferent in failing to train and/or supervise employees, such that the failure to train and or supervise reflects a deliberate or conscious choice by Defendant Muncy.

99.     As a direct result, the Plaintiffs were injured.

100.    Defendant Muncy was acting under color of law.

## **PRAYER**

WHEREFORE, based on the above stated facts, the plaintiffs respectfully requests that this Honorable Court award:

21

1.     Damages against the defendants in an amount to be determined at trial which will fairly and reasonably compensate the plaintiffs for all compensatory damages to be proven at trial;

2.     Punitive damages against the individual defendants in an amount to be determined at trial; and

3.     Reasonable attorney fees and costs pursuant to 42 U.S.C. 1988.

**PLAINTIFFS DEMAND A TRIAL BY JURY**


                              JASON TARTT,
                              DONNIE HAIRSTON,
                              VENTRISS HAIRSTON,
                              By Counsel


/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com