IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

JASON B. TARTT, et al.,

       Plaintiffs,

v.                       CIVIL ACTION NO. 1:22-00327

DALTON T. MARTIN, et al.,

       Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the court is defendants' amended motion for summary judgment. (ECF No. 46). For the reasons explained below, the motion is **GRANTED** in part and **DENIED** in part.

### I.    Background

This case arises from a police interaction, in which plaintiff Jason Tartt was arrested and charged with obstruction of law enforcement officers for "refus[ing] to give his information to identify him[,]" (McDowell Cty. Criminal Compl., ECF No. 46-2), despite providing his name when initially requested.

On a motion for summary judgment, courts "view the evidence in the light most favorable to the non-moving party" and refrain from "weighing the evidence or making credibility determinations." Lee v. Town of Seaboard, 863 F.3d 323, 327 (4th Cir. 2017) (quoting Jacobs v. North Carolina Admin. Off. of

the Cts., 780 F.3d 562, 568-69 (4th Cir. 2015)).  Therefore, the

court recites the following facts in the light most favorable to

Mr. Tartt and his fellow plaintiffs.

On August 7, 2020, the Chief Deputy of the McDowell County

Sheriff's Department, defendant James "Boomer" Muncy, received

an investigative tip on Facebook.  (See ECF No. 46-3).  The

sender of the Facebook messages, Michelle Bradley, informed

Chief Deputy Muncy that she had reason to believe "they" were

growing marijuana in "the black camp":

> Hey up there where budda used to live
> in the camp they say it smelled like
> marijuana so bad the smell would knock u
> out.  I know that they are growing it up
> there maybe just check it out if you wanted
> too [sic].  Thanks so much for checking on
> us als0 [sic].
>
> . . . .
>
> Budda little fon.  His name was Willard
> Allen.  But the exact directions is go up
> the holler and instead of going towards
> where Ramona Benton lives turn across that
> first wooden bridge where that church is the
> camp.  Rex and them all said you can smell
> it really strong as you go in the black
> camp[.]

Id.  To investigate the tip, Chief Deputy Muncy assigned

defendant Dalton Martin, who was then a Sheriff's Deputy.  (See

Muncy Dep. Tr. at 10:4-5, ECF No. 46-6).

That evening, Deputy Martin, accompanied by defendant

Deputy Jordan Horn, interviewed Ms. Bradley at her home.  (See

Horn Dep. Tr. at 15:10-17, ECF No. 50-3).  She told them the
general area where the suspected marijuana was being grown and,
according to Deputy Horn, she specifically told them that
"there's a church located up in that area, and she had stated
that up by that church there was a strong odor of marijuana in
that area and her kids had told her that because they ride ATVs
in that area."  (Id. at 16:17-24).  She then gave them
directions "to where the church was."  (Id. at 20:16-20).

    Armed with this information, the deputies went to
investigate.  On their route to the church, they drove down a
gravel driveway that led to two houses and a dead-end.  (See id.
at 21:10-16).  Beyond the end of the driveway, and up a "well-
worn" ATV trail a good distance from the two houses, and on a
separately owned property, was the church described by Ms.
Bradley.  (See id. at 27:12-21, 29:5-6).  Defendants describe
the church and the trail leading to it as appearing to be "open
to the public, and there are no signs indicating that the road
is private property, nor a barrier limiting access to the
public."  (Mem. Supp. Summ. J. at 14, ECF No. 47).

    Before investigating the area around the church, however,
the deputies knocked on the door of the house closest to the ATV
trail.  (See Horn Dep. Tr. at 23:1-2, ECF No. 50-3).  When no
one answered, the deputies turned their attention to the house
further from the ATV trail where plaintiffs Donnie and Ventriss

3

Hairston, a retired African American couple, lived.  (See id. at
23:1-18).  The Hairstons allege that they "initially waved at
[Deputy Martin] as he approached [but] as he neared, [he]
appeared to be agitated and angry."  (Am. Compl. at ¶ 13, ECF
No. 3).  They allege that then "[w]ithout providing any context,
or asking any other questions, [Deputy Martin] immediately asked
[them] if they were growing marijuana."  (Id.).  This account is
undisputed insofar as Deputy Martin "just come out and asked
them if they growed [sic] marijuana."  (Horn Dep. Tr. at 23:6-7,
ECF No. 50-3).

The Hairstons, who had recently moved to McDowell County,
allege that they felt threatened by the officers and called
their landlord, a longtime resident of McDowell County, Mr.
Tartt.  (See Am. Compl. at ¶ 15-16, ECF No. 3; Tartt Dep. at
42:15-43:1-21, ECF No. 50-5).  Mr. Tartt rented the two homes to
Hairstons and their neighbors, the Fergusons.  (See id).  Mr.
Tartt and the Fergusons were African American as well.  (See id.
¶ 80; Pls.' Resp. at 17, ECF No. 50).  The Hairstons informed
Mr. Tartt that "police officers had arrived on the properties
owned by him, and were walking around, looking through windows
and had accused the Hairstons of growing marijuana."  (Am.
Compl. at ¶ 16, ECF No. 3).  Mr. Tartt lived nearby and began
driving his side-by-side utility vehicle to the Hairston's home

in response to their call.  (See Tartt Dep. Tr. at 42:15-22, ECF No. 50-5).

In the meantime, the deputies walked up the ATV trail and beyond the church to a neighboring property where they discovered what they believed to be four marijuana plants.  (See Horn Dep. Tr. at 26:11-14, 29:2-6, ECF No. 50-3).  Deputy Horn testified that there "was also a bag of Miracle-Gro laying on the ground beside of the marijuana." (Id. at 29:3-4).  When they returned down the trail and back to the Hairston residence, Deputy Horn claims that he also saw a bag of Miracle-Gro in an ATV parked in front of the Ferguson residence.  (See id. at 29:7-11).  When the deputies returned to the Hairston residence, Mr. Tartt had joined them on the front porch.  (See id. at 31:5-8).

At this point, Deputy Martin activated his body-worn camera, which initially shows 63-year-old Ms. Hairston asking for the deputies' names so that she could write them down.  (See Martin Body Cam., ECF No. 46-1).  She explained that she wanted their names "just because in the season that we're living in, I think it's important that I have your names." (Id.)  She later explained that by "season we're living in" she was referring to the "George Floyd incident" that had occurred only months earlier.  (See Pls.' Resp. at 6 n.9, ECF No. 50).  In the body-camera footage, Ms. Hairston continued, "having your name makes

5

me feel more secure.  As I said, we came here June 28th—we're actually new here.  And for the police officers in this area to come up and say 'are you growing marijuana'—that is preposterous to me."  (See Martin Body Cam., ECF No. 46-1).

As Deputy Martin began to argue with Ms. Hairston about his investigative approach, Mr. Tartt interjected and asked the deputies, "Y'all looking for something over here at his house"?—referring to the Ferguson's home where the officers had initiated their investigation.  (See id.).  This prompted Deputy Martin to ask for Mr. Tartt's name, to which he responded—on the first request—"Jason Tartt."  (See id.).  Deputy Martin then repeated, "Jason Tartt."  (See id.).  Deputy Martin then immediately returned his attention to Ms. Hairston and inquired, in a confrontational fashion, "What do you mean by the season we're living in, ma'am"?  (Id.).  This prompted Mr. Tartt to intervene again and ask Deputy Martin "What do you need? You got any questions for me"?  (Id.).

Deputy Martin responded, "No, I will collect some information from you in a minute—your name, date of birth, and such."  (Id.).  To which, Mr. Tartt responded, "What do you need my information for"?  (Id.).  Deputy Martin responded, "These two homes is near that marijuana grow, so i'd just like to have your name."  (Id.).  Mr. Tartt stated, "I don't feel comfortable giving you my name and date of birth."  (Id.).  Deputy Martin

6

replied, "Well this is a criminal investigation—you own these two homes, so by law, you do have to give me your name and date of birth."  (Id.).

Ms. Hairston then stated to Deputy Martin that "you scared me," in reference to him implying that she grew marijuana. (Id.).  Deputy Martin raised his voice and asked, "Scared you? By asking you a question"?  (Id.).  He then walked to his police cruiser and back to the front porch and argued to Ms. Hairston that "[t]o say somebody scared you because they asked you a question is ridiculous."  (Id.).  He then asked Mr. Tartt for his name again.  (See id.).  Mr. Tartt responded, "I'm not giving you my information."  (Id.).  Mr. Tartt later explained that he decided not to provide additional information to the deputies because "[b]eing a former Military Police officer, [he] knew that he was being victimized and retaliated against by [Deputy Martin]."  (Am. Compl. at ¶ 25, ECF No. 3).

After several requests, Mr. Tartt declined to give his date of birth, arguing that the officers had no basis to suspect him of committing a crime.  (See Martin Body Cam., ECF No. 46-1). Deputy Martin then ordered the Hairstons into their home, stepped onto the porch, and nudged Mr. Hairston inside.  (See id.).  Deputy Martin grabbed Mr. Tartt's arm with both hands, pulled it behind his back, said "I'm going to arrest you," and handed handcuffs to Deputy Horn to put on Mr. Tartt's wrists.

7

(See id.).  After Deputy Horn handcuffed Mr. Tartt, both
deputies escorted him to the police cruiser.  (See id.).

Once in the cruiser, Deputy Martin asked dispatch to
"locate a Jason Tart 'Tango Alpha Romeo Tango' by name out of
the Hartwell area."  (Id.).  The dispatcher responded, "He's not
on file in West Virginia."  (Id.).  Then another individual
chimed in on the radio and said, "If you had a date of birth on
him, you probably could run him in Virginia though, Dalton."
(Id.).  Officer Martin responded, "We located a marijuana grow
right here near his property.  He's refusing to give his date of
birth, name."  (Id.).  The individual responded "obstructing"?
(Id.).  Deputy Martin then informed Mr. Tartt that "[a]ll right
sir, at this time you are under arrest for obstructing."  (Id.).

On the ride to the jail, Deputy Martin asked Mr. Tartt,
"You still going to refuse to identify yourself"?  (Id.).  To
which Mr. Tartt responded, "You have my name, I told you my
name."  (Id.).  Deputy Martin replied, "I need your date of
birth . . . I tried to run you by name before we pulled out . .
. I couldn't find nothing."  (Id.).  Deputy Horn interjected and
said, "Because he didn't have a date of birth."  (Id.).  Deputy
Martin then threatened Mr. Tartt that "I mean I'll put you in
jail as John Doe, and when you decide to give your name and date
of birth is when you'll get out."  (Id.).  At that point Mr.
Tartt said, "My date of birth is 1973, May 4th."  Deputy Martin

then asked, "Now how easy was that"?  Mr. Tartt responded, "Well
since you're going to charge me anyway, they're going to need
the information—I don't have any ID on me."  (Id.).  Deputy
Martin did not initially call the date of birth into dispatch
when Mr. Tartt provided it.

However, twelve minutes later while still on the way to
jail, Mr. Tartt heard on the radio traffic that they were
spelling his name "T-A-R-T" and informed Deputy Martin that it
is spelled "T-A-R-T-T."  (Id.).  Deputy Martin then immediately
radioed, "Patrol, subject is going to give date of birth, you
ready"?  (Id.).  However, before providing Mr. Tartt's date of
birth, Deputy Martin corrected his misspelling of Mr. Tartt's
name: "First name Jason, last name Tartt, Tango-Alpha-Romeo-
Tango-Tango . . . 5/4/73."  (Id.).  With this information,
dispatch located Mr. Tartt "on file" in West Virginia.  (See
id.).  The question remains whether a correct spelling of Mr.
Tartt's name alone would have yielded the same result and been
sufficient "to identify" him in the database.

Mr. Tartt spent the night in jail, and the next day, Deputy
Martin submitted a criminal complaint to the McDowell County
Magistrate, charging Mr. Tartt with "Obstructing an Officer" for
"refus[ing] to give his information to identify him."  (McDowell
Cty. Criminal Compl., ECF No. 46-2).  In support of the criminal

complaint, Deputy Martin provided the following sworn statement

of the events preceding the arrest:

> This Deputy received a complaint at the
> McDowell County Sheriff[']s Office for a
> marijuana grow in the area of Baptist Dr.
> This Deputy and Deputy J.A. Horn responded
> to the area to investigate.  Upon our
> arrival we incountered [sic] by two elderly
> subjects who was on the pourch [sic] and
> asked them if they growed [sic] marijuana
> and they stated "No".  Shorty [sic] the
> above said defendant arrived and stated that
> he owned the property where we was.  This
> Deputy and Deputy J.A. Horn began walking to
> the edge of the defendant[']s said property
> line and could smell the odor of marijuana
> in the air.  This Deputy and Deputy J.A.
> Horn walked approximately 50 foot [sic] from
> the defendant[']s said property line and
> located 4 marijuana plants that was
> approximately 5 Ft tall.  This Deputy and
> Deputy J.A. Horn returned to the above said
> defendant and as we came walking towards him
> he stated "Did yal [sic] find what you was
> looking for".  There was no other homes
> other than what defendant owned on the said
> street.  This Deputy had reason to believe
> that the defendant had committed a crime and
> a reasonable person would suspect that the
> marijuana plants was the defendants.  This
> deputy asked the defendant for his
> information in order to identify the
> defendant and he refused stating "I don't
> feel comfortable giving you that
> information".  This deputy then told the
> defendant that he was required to give his
> information.  The defendant still refused to
> give his information to identify him.  This
> Deputy then told the defendant that he would
> be placed under arrest if he didn[']t
> identify his-self and he stated "Well go
> ahead and arrest me."  This deputy first
> tried another means to identify the
> defendant but it wasn[']t effective.  This
> Deputy then attempted to place the defendant

> under arrest and he refused to place his
> hands behind his back while stating "Don[']t
> touch me , [sic] get your hands off me"
> [sic] The defendant eventually stopped
> resisting after repeated commands to place
> his hands behind his back.  The defendant
> was placed under arrest and transported to
> the McDowell County Sheriff[']s Office for
> Processing.  The above said events did occur
> in the Heartwell [sic] area of McDowell
> County, West Virginia.

(Id.).  Based on this sworn statement, the county magistrate
found probable cause to support the charge of obstructing a law
enforcement officer, in violation of West Virginia Code § 61-5-
17 (2020).  (See id.).  The charges were later dismissed by the
Circuit Court of McDowell County.

Mr. Tartt, along with the Hairstons, filed this lawsuit,
asserting the following claims against the deputies:  (1) False
arrest of Mr. Tartt under 42 U.S.C. § 1983; (2) malicious
prosecution of Mr. Tartt under 42 U.S.C. § 1983; (3)
unreasonable search and seizure of the Hairstons under 42 U.S.C.
§ 1983; (4) First Amendment retaliation against all plaintiffs
under 42 U.S.C. § 1983; and (5) conspiracy to deprive plaintiffs
of their civil rights under 42 U.S.C. § 1985.  (See Am. Compl.,
ECF No. 3).  Also named as defendants are the McDowell County
Commission and Chief Deputy Muncy.  Plaintiffs seek to hold the
McDowell County Commission liable for the individual deputies'
alleged § 1983 violations under Monell v. Department of Social
Services of City of New York, 436 U.S. 658 (1978), and they seek

11

to hold Chief Deputy Muncy liable for the alleged § 1983 violations under a supervisory liability theory.  (See id.).

Defendants move for summary judgment on each count.  They argue that Deputies Martin and Horn are entitled to qualified immunity from Mr. Tartt's § 1983 claims for false arrest and malicious prosecution, and the Hairston's § 1983 claims for unlawful search and seizure.  (See Mem. Supp. Summ. J. at 6-14, ECF No. 47).  Defendants also argue that plaintiffs' First Amendment retaliation claims, § 1985 conspiracy claims, supervisory liability claims, and Monell claims fail "as a matter of law."  (See id. at 14-19).

## II.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party that moves for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law.  An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant."  Sedar v. Reston Town Ctr. Prop.,

LLC, 988 F.3d 756, 761 (4th Cir. 2021) (quoting Wai Man Tom v. Hosp. Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020)).

Once the moving party establishes this initial burden, "the nonmoving party must then go beyond the pleadings and affidavits and show that there are 'specific facts showing that there is a genuine issue for trial.'" Shaw v. Foreman, 59 F.4th 121, 129 (4th Cir. 2023) (quoting Celotex, 477 U.S. at 324). To show a genuine issue for trial, the nonmoving party must present more than "[t]he mere existence of a scintilla of evidence[.]" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). This means "conclusory allegations or denials, without more, are insufficient to preclude granting [a] summary judgment motion." Id. (quoting Wai Man Tom, 980 F.3d at 1037).

### III. Discussion

#### A. Qualified Immunity

Deputies Martin and Horn claim qualified immunity from (1) Mr. Tartt's false arrest and malicious prosecution claims, and (2) the Hairstons' unlawful search and seizure claims.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To that end,

"[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id.

"The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Id. (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). The doctrine "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Hupp v. Cook, 931 F.3d 307 (4th Cir. 2019) (quoting Stanton v. Sims, 571 U.S. 3, 5 (2013)).

The "qualified immunity analysis typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." Raub v. Campbell, 785 F.3d 876, 881 (4th Cir. 2015). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he or she is doing violates that right." Adams v. Ferguson, 884 F.3d 219, 226 (4th Cir. 2018) (cleaned up). "The question of whether a

14

right is clearly established is a question of law for the Court to decide." Hupp, 931 F.3d at 317-18 (citing Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992)). "The question of whether a reasonable officer would have known that the conduct at issue violated that right, on the other hand, cannot be decided on summary judgment if disputes of the historical facts exist." Id. (citing Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015)). In any event, "the legal question of a defendant's entitlement to qualified immunity under a particular set of facts should be decided by the court, not by the jury." Willingham v. Crooke, 412 F.3d 553, 560 (4th Cir. 2005). Therefore, "when resolving the issue of qualified immunity at summary judgment, a court must ascertain the circumstances of the case by crediting the plaintiff's evidence and drawing all reasonable inferences in the plaintiff's favor." Williams v. Strickland, 917 F.3d 763, 768 (4th Cir. 2019) (quoting Brown v. Elliott, 876 F.3d 637, 641-42 (4th Cir. 2017)).

With the relevant standards established, the court turns now to the claims against which the deputies assert qualified immunity.

### 1.   False Arrest and Malicious Prosecution

Defendants combine Mr. Tartt's false arrest and malicious prosecution claims into one Fourth Amendment claim for purposes of their motion for summary judgment. They do not challenge the

individual elements of the malicious prosecution claim.  Rather,
they argue that Mr. Tartt's arrest was lawful and that they are
entitled to qualified immunity from any claims arising from it.

Defendants say that Mr. Tartt cannot satisfy either prong
of the qualified immunity inquiry; they argue that Mr. Tartt
fails to establish a constitutional violation, and that the
constitutional right was not "clearly established."

### (a). Constitutional Violation

As to the first prong, Mr. Tartt alleges that the deputies
violated his rights under the Fourth Amendment to the United
States Constitution by arresting and prosecuting him without
probable cause.

The Fourth Amendment secures "[t]he right of the people to
be secure in their persons . . . against unreasonable searches
and seizures." U.S. Const. amend. IV.  "A seizure is unreasonable
under the Fourth Amendment if it is not based on probable
cause."  Hupp, 931 F.3d at 318 (citing Dunaway v. New York, 442
U.S. 200, 213 (1979)).  Assessing whether an arrest "was
reasonable or supported by probable cause is evaluated under an
objective standard, based on what a prudent officer would have
believed under the circumstances."  Merchant v. Bauer, 677 F.3d
656, 662 (4th Cir. 2012) (citing Harlow v. Fitzgerald, 457 U.S.
800, 819 (1982)).

"[I]n Fourth Amendment cases, objective reasonableness is not a jury question—it is a question of law." Armstrong v. Hutcheson, 80 F.4th 508, 514 (4th Cir. 2023). Therefore, at the summary judgment stage, "the court must decide, under the nonmovant's version of the facts, the purely legal issue of whether a constitutional violation has occurred." Id. at 515. "That means that if, after construing the historical facts in favor of the non-moving party, the court determines the officers' conduct was unreasonable, summary judgment for the officers is improper." Id. Even when that is the case, "a genuine question of material fact regarding [w]hether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial." Ray v. Roane, 948 F.3d 222, 228-29 (4th Cir. 2020) (quoting Willingham, 412 F.3d at 559).

Mr. Tartt contends that the deputies needed not only probable cause but also an arrest warrant or exigent circumstances to arrest him on the Hairston's front porch. (See Pls.' Resp. at 13, ECF No. 50). However, this is not the case. "[T]he Fourth Amendment has drawn a firm line at the *entrance* to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980) (emphasis added)). For that reason, when supported by probable cause, an arrest on the porch of a home "hardly runs afoul of the Fourth Amendment." Meeks v.

17

McClung, No. 2:20-cv-00583, 2023 WL 8791686, at *10 (S.D.W. Va. Dec. 19, 2023) (Johnston, C.J.) (citing Payton, 445 U.S. at 590).  The issue in this case is whether the deputies had probable cause to arrest Mr. Tartt.

The deputies raise two arguments as to why probable cause existed.  They first argue that probable cause existed because the McDowell County Magistrate found probable cause based on Deputy Martin's sworn statement in the "warrant's affidavit." (See Mem. Supp. Summ. J. at 8, ECF No. 47).  Alternatively, the deputies argue that "'[p]utting the arrest warrant aside,' Deputy Martin had probable cause to arrest Tartt for obstruction."  (Id.).

Before addressing the merits of these arguments, the court must clarify an important point:  This was a warrantless arrest. What defendants call an arrest warrant is a post-arrest criminal complaint, in which the magistrate found probable cause to support the obstruction charge based on Deputy Martin's affidavit in support of the complaint.

Turning now to the first argument, that the magistrate's finding of probable cause is dispositive, the court rejects it. In some circumstances, a finding of probable cause "weigh[s] heavily toward a finding that [an officer] is immune." Bauer, 677 F.3d at 664 (quoting Wadkins v. Arnold, 214 F.3d 535, 541 (4th Cir. 2000)).  This generally applies when an officer

18

receives an arrest warrant before making an arrest:  "When a police officer protects a suspect's rights by obtaining a warrant from a neutral magistrate, the officer should, in turn, receive some protection from suit under 42 U.S.C. § 1983." Wadkins, 214 F.3d at 543 (quoting Torchinsky v. Siwinski, 942 F.2d 257, 262 (4th Cir. 1991)).  This is because an officer's "actions in seeking the arrest warrants and the magistrate's determination of probable cause provide additional support for [the officer's] claim that he acted with objective reasonableness."  Torchinsky, 942 F.2d at 262.

In this case, defendants claim that the magistrate's probable cause finding, which came after Mr. Tartt's arrest, entitles them to qualified immunity from his false arrest claim. This is not so.  The post-arrest finding sheds no light on the reasonableness of the deputies' conduct based on the circumstances at the time of the arrest, unlike when officers act pursuant to an arrest warrant issued before an arrest. Therefore, the magistrate's finding of probable cause in the post-arrest criminal complaint does not entitle the deputies to qualified from Mr. Tartt's false arrest claims.

However, unlike with false arrest claims, a post-arrest finding of probable cause may be relevant to malicious prosecution claims because, in some cases, the post-arrest finding sheds light on the reasonableness of the decision to

19

move forward with a criminal prosecution.  See Hupp, 931 F.3d at
323-24.  However, this is not the case when a magistrate's
finding was based on an affidavit in which an officer
"deliberately or with a reckless disregard for the truth made
material false statements in his affidavit or omitted from that
affidavit material facts with the intent to make, or with
reckless disregard of whether they thereby made, the affidavit
misleading."  Miller v. Prince George's Cty., 475 F.3d 621, 627
(4th Cir. 2007).

        Taking the evidence in the light most favorable to Mr.
Tartt, Deputy Martin made material misstatements and omissions
that tainted the magistrate's probable cause evaluation.  For
example, Deputy Martin swore that "[t]his deputy had reason to
believe that the defendant had committed a crime and a
reasonable person would suspect that the marijuana plants was
the defendants."  (McDowell Cty. Criminal Compl. at 2, ECF 46-
2).  This is contrary to the evidence in this case.  The
marijuana was not on Mr. Tartt's property, no evidence linked
him to it, he did not live in either of the houses where the
deputies initiated their investigation, and Deputy Martin knew
the marijuana was grown on an ATV trail accessed by the public.

        Tellingly, Deputy Martin's sworn statement was directly
contradicted by his partner's testimony.  Deputy Horn testified

                                20

that there was no reason to suspect that Mr. Tartt grew
marijuana or that he committed a crime:

>     Q.  Did you acquire any information
>     during this knock and talk that Jason Tartt
>     had anything to do with growing marijuana?
>
>     A.  No, sir.
>
>     Q.  During the—during this incident did
>     you ever observe Jason Tartt commit any
>     crime.
>
>     A.  No, sir.  I didn't observe him
>     commit any crime.

(Horn Dep. Tr. at 29:1-19, ECF No. 46-5).

Considering this testimony and the lack of evidence
connecting Mr. Tartt to the marijuana being grown on someone
else's property, Deputy Martin's unequivocal, sworn statement
that he believed Mr. Tartt "had committed a crime and a
reasonable person would suspect that the marijuana plants was
the defendants," is misleading.

Similarly, Deputy Martin's affidavit in support of the
criminal complaint repeatedly says that Mr. Tartt refused to
"give his information to identify him." (See McDowell Cty.
Criminal Compl. at 2, ECF No. 46-2).  Yet, the affidavit omits
the facts that Mr. Tartt provided his name upon first request,
and many times thereafter, and that he was never asked to
provide a government issued ID before his arrest.  These
omissions are particularly troubling because there is no statute

or case law in West Virginia expressly making nondisclosure of one's date of birth illegal.  These were material facts that the magistrate needed to make an informed assessment of whether Mr. Tartt "forcibly or illegally" hindered law enforcement officers, as required to support an obstruction charge.  See W. Va. Code § 61-5-17(a).

For these reasons, the magistrate's finding of probable cause does not entitle the deputies to qualified immunity from Mr. Tartt's Fourth Amendment claims.

The court turns now to the deputies' second argument for qualified immunity that, notwithstanding the post-arrest criminal complaint, probable cause supported an arrest for obstruction of a law enforcement officer under West Virginia Code § 61-5-17.

That statute provides, in pertinent part, that "[a] person who by threats, menaces, acts, or otherwise forcibly or illegally hinders or obstructs or attempts to hinder or obstruct a law-enforcement officer . . . acting in his or her official capacity is guilty of a misdemeanor . . . ."  Id.  It is well established that "[i]n the absence of force, 'the key to determining whether conduct . . . constitutes the offense of obstruction under W. Va. Code § 61-5-17 is whether the conduct at issue is illegal.'"  Smith v. Davis, No. 1:20CV54, 2022 WL 1206089, at *4 (N.D.W. Va. Apr. 22, 2022) (cleaned up) (quoting

State v. Carney, 663 S.E.2d 606, 610 (W. Va. 2008)).  Notably,
"where 'force is not involved to effect an obstruction,' the
resulting obstruction itself is insufficient to establish the
illegality required by section 61-5-17."  Hupp, 931 F.3d at 319
(quoting Carney, 663 S.E.2d at 611).

The Supreme Court of Appeals of West Virginia has been
clear that refusing to identify oneself is not illegal:
"Refusal to identify oneself to a law enforcement officer does
not, standing alone, form the basis for a charge of obstructing
a law enforcement officer in performing official duties in
violation of West Virginia Code § 61–5–17(a) (2001) (2002
Supp.)."  Syl. Pt. 4, in part, State v. Srnsky, 582 S.E.2d 859
(W. Va. 2003).  This is because "[t]he freedom of individuals
verbally to oppose or challenge police action without thereby
risking arrest is one of the principal characteristics by which
we distinguish a free nation from a police state."  Id. at 868
(quoting City of Houston v. Hill, 482 U.S. 451 (1987)).
Therefore, the Supreme Court of Appeals has explained that "if
mere questioning of an officer does not constitute unlawful
obstruction, it stands to reason that silence *alone* cannot
establish the offense."  Id.

Though refusing to identify oneself to a law enforcement
officer alone does not violate the law, "the charge of
obstructing an officer may be substantiated when a citizen does

23

not supply identification when required to do so by express statutory direction or when the refusal occurs after a law enforcement officer has communicated the reason why the citizen's name is being sought in relation to the officer's official duties."  Id.

In any event, an obstruction charge requires forcible or illegal conduct that "interferes with a police officer's discharge of official duties."  Jafary v. City of Beckley, No. 5:20-cv-00647, 2021 WL 6125831, at *4 (S.D.W. Va. Dec. 28, 2021) (quoting Hupp, 931 F.3d at 319) (emphasis added).  It is well settled under West Virginia law that "not every act of questioning the authority of a police officer constitutes obstruction."  Srnsky, 582 S.E.2d at 868 (citing Davis, 483 S.E.2d at 86).

When viewing the facts in the light most favorable to Mr. Tartt, it was objectively unreasonable for the officers to arrest and jail him for not disclosing his date of birth.  There are three primary reasons why this is so:  (1)  The deputies provided an overly attenuated basis as to why his name was being sought "in relation to" their investigation, (2)  Mr. Tartt's withholding of his date of birth did not satisfy the "illegal" act predicate for an obstruction charge, and (3) his refusal did not interfere with the deputies' investigation.

24

### (i). "In relation to" requirement

First, viewing the facts in Mr. Tartt's favor, the deputies provided an insufficient basis as to why his name was being sought "in relation to" their investigation.  Defendants argue that "Deputy Martin had reasonable suspicion to question Tartt regarding the marijuana plants; therefore, Deputy Martin had probable cause to arrest Tartt for obstructing his investigation because he refused to fully identify himself."  (Mem. Supp. Summ. J. at 9, ECF No. 47).

While defendants equate this to a reasonable suspicion requirement, the Supreme Court of Appeals of West Virginia has not explained it as such, nor has that court specified what satisfies the requirement.  However, in explaining what does not satisfy it, that court has made clear that there must be a link between an individual and officers' duties before a person must supply identification.  For instance, in Srnsky, the case upon which defendants rely, the court held that an individual was not required to supply identification to law enforcement officers who demanded it to see if he was one of the individuals for whom they had an arrest warrant.  582 S.E.2d at 868.  The court explained that he had no duty to identify himself because he "was not under arrest at the time he was questioned and . . . was not informed by the officers that they had a warrant for his

arrest or the basis on which the warrants they had were issued[.]" Id.

In this case, defendants attempt to establish the necessary link by arguing that "[b]ased upon the close proximity of the marijuana plants and the similar bags of 'miracle grow' near the four-by-four ATV, the Deputies had reasonable suspicion to question Tartt about the marijuana plants." (Mem. Supp. Summ. J. at 9, ECF No. 47). What defendants fail to mention, however, is that the ATV where the bag of Miracle-Gro was located was not the utility vehicle driven by Mr. Tartt. It belonged to the Fergusons and was parked in front of their home before Mr. Tartt arrived. (See Horn Dep. 29:7-11, ECF No. 50-3; Tartt. Dep. 53:17-18, ECF No. 50-5; Martin Body Cam. at 16:00, ECF No. 46-1). If anything, the bag of Miracle-Gro being in a vehicle parked at the Ferguson home—where the deputies initiated their investigation—undermines the deputies' argument that there was reason to suspect Mr. Tartt of growing the marijuana. The truth of Deputy Horn's testimony that he saw the Miracle-Gro and that it caused suspicion of Mr. Tartt is also debatable because there is no mention of it in the criminal complaint's affidavit, which wants for evidentiary enhancement.

Also, defendants' argument that Mr. Tartt was in "close proximity" to the alleged marijuana plants is not true and does not link him to the investigation. The plants were not on his

26

property, he did not live in either of the houses the deputies were investigating, and the ATV trail was accessible to the public.  Based on the circumstances before the deputies, Mr. Tartt was only in "close proximity" when summoned to the property by the Hairstons.

### (ii).  Illegal Act Predicate

Even if the officers had a sufficient link between Mr. Tartt and the investigation to require his identification, he did not commit an illegal act by not providing his date of birth:  "[W]hen force is not used, obstruction lies only where an illegal act is performed."  Hupp, 931 F.3d at 319.  The law requires only that a person "supply identification" after officers explain why his "name" is being sought in connection with official police duties.  See Syl. Pt. 4, in part, Srnsky, 582 S.E.2d at 859.

Defendants concede that Mr. Tartt provided his name upon first request and several times thereafter, but argue, without legal support, that "[a] name is not always sufficient to identify oneself to a law enforcement officer; however, as here, Tartt did not object to providing his name but refusing his date of birth was insufficient to clearly identify him."  (Mem. Supp. Summ. J. at 9, ECF No. 47).

The court rejects this argument.  As an initial matter, a reasonable interpretation of "supply identification" would

27

suggest that a person must provide a government issued photo ID or their name.  The deputies never asked for a photo ID and Mr. Tartt provided his name multiple times.  Defendants point to no authority to support the deputies' contention that a person must be located in a police database before he or she can be deemed to "supply identification."  Even if that were the case, drawing inferences in Mr. Tartt's favor, they would have found him in that database had they verified the spelling of his name and called it in correctly, and he adequately "supplied identification" when he provided his name multiple times without hesitation.

Also, under this view of the facts, it was not illegal for Mr. Tartt to refuse to provide more information to the deputies. He only refused after the deputies became increasingly hostile, and he reasonably believed, based on his experience as law enforcement officer, he was the victim of police retaliation. The law in West Virginia is clear that individuals possess the First Amendment right to peacefully oppose police authority "without thereby risking arrest."  Srnsky, 582 S.E.2d at 868. And for that reason, "lawful conduct that effects an obstruction, including questioning or challenging police officers, is not sufficient to establish the statutory offense [of obstruction]."  Jafary, No. 5:20-cv-00647, 2021 WL 6125831, at *4.

28

### (iii).  Interference

Additionally, even assuming for the sake of argument that it was illegal for Mr. Tartt not to provide his date of birth to the deputies, there is no evidence that it interfered with the deputies' investigation:  "[T]o secure a conviction under section 61-5-17(a), the State must show 'forcible or illegal conduct that <u>interferes</u> with a police officer's discharge of official duties.'"  <u>Hupp</u>, 931 F.3d at 319 (emphasis added) (quoting <u>State v. Davis</u>, 735 S.E.2d 570, 573 (W. Va. 2012)). "To 'interfere' is to check or hamper the action of the officer, or to do something which hinders or prevents or tends to prevent the performance of his legal duty . . . ."  <u>Davis</u>, 735 S.E.2d at 87 (quoting <u>State v. Johnson</u>, 59 S.E.2d 485, 487 (1950)).

Mr. Tartt's refusal to provide his date of birth had no tendency to prevent the deputies' from performing their legal duties.  The deputies had no evidence linking him to the suspected crime; he did not live in either of the houses they were investigating; and he identified himself to the deputies several times.

For these reasons, when resolving inferences against the deputies, they lacked probable cause to arrest Mr. Tartt for obstruction.  The next question in the qualified immunity analysis is whether the deputies violated Mr. Tartt's clearly established rights.

### (b). Clearly Established

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Reynolds v. Singh, No. 5:23-CV-207-FL, 2024 WL 1311336, at *7 (E.D.N.C. Mar. 27, 2024). Therefore, "[i]f a person is arrested when no reasonable officer could believe . . . that probable cause exists to arrest that person, a violation of a clearly established Fourth Amendment right to be arrested only upon probable cause ensues." Jafary, No. 5:20-cv-00647, 2021 WL 6125831, at *6 (quoting Rogers v. Pendleton, 249 F.3d 279, 290 (4th Cir. 2001)).

The deputies argue that Mr. Tartt has not established the violation of a clearly established right because "[u]nder the circumstances presented to Deputy Martin, a reasonable officer could have concluded that Tartt's refusal to answer questions in relation to the nearby plot of marijuana plants constituted obstruction." (Mem. Supp. Summ. J. at 10, ECF No. 47). The court disagrees.

As discussed above, viewing the facts in the light most favorable to Mr. Tartt, the deputies arrested him without probable cause, and no reasonable officer would have found probable cause to arrest him for not providing his date of birth. Therefore, if a jury resolves these inferences against

the deputies, they violated his clearly established right against unreasonable seizure.

In addition to defendant's qualified immunity argument, they argue that "Deputy Horn did not 'seize' Tartt as a matter of law because he did not arrest him." (Id.).  However, this argument is meritless because Deputy Horn placed the handcuffs on Mr. Tartt's wrists and escorted him into the back of the police car.  (See Martin Body Cam. at 5:58, ECF No. 46-1).  The deputies also acted in concert throughout the encounter, so it is immaterial which one physically arrested him.

Defendants' motion for summary judgment is **DENIED** as to Mr. Tartt's Fourth Amendment claims.

### 2.    Search and Seizure of the Hairstons

The court now turns to the deputies' assertion of qualified immunity from the Hairston's unreasonable search and seizure claims.  Defendants again challenge both prongs of the qualified immunity inquiry, arguing that the deputies did not violate the Hairston's constitutional rights and that those rights were not clearly established.

### (a).  Constitutional Violation

The Hairstons allege two Fourth Amendment violations: unreasonable search and unreasonable seizure.  The court begins with the unreasonable search claims.

The Hairstons allege that the deputies executed an unreasonable search of their property because they "engaged in a general search of the curtilage of their property . . . ." (Am. Compl. at ¶ 56, ECF No. 3). However, the Hairstons offer no evidence that the deputies searched their front porch or other areas of their home.

The deputies engaged the Hairstons in a consensual, albeit confrontational, knock-and-talk. "A 'knock and talk' is a consensual encounter and therefore does not violate the Fourth Amendment, even absent reasonable suspicion." United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006). The officers remained in the driveway, which was a lawful vantage point of the front porch and the outside of the Hairston's home: "[W]hen the police come on to private property to conduct an investigation . . . and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment." United States v. Hatfield, 333 F.3d 1189, 1194 (10th Cir. 2003) (quoting 1 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 2.3(f), at 506-08 (3d ed. 1996)). Thus, there was no search during the questioning of the Hairstons.

The deputies only came upon the front porch to arrest Mr. Tartt. Any "search" occurred by the church where the alleged

marijuana plants were.  However, this was on someone else's property, and that search is not at issue because "Fourth Amendment rights are personal, and may be enforced only by persons whose *own* protection under the Amendment has been violated."  Rakas v. Illinois, 439 U.S. 128, 133–34 (1978). Therefore, the Hairstons' unreasonable search claims fail on the first prong of qualified immunity:  there was no constitutional violation.

The court turns next to the Hairstons' unreasonable seizure claims.  They allege that the deputies unreasonably seized them by "detaining them for an unreasonable amount of time, interrogating them against their will, making them feel scared and unsafe . . . ." and "subsequently forc[ing] the Hairstons off their own front porch, and into their home, forcibly shoving Mr. Hairston into his doorway, closing his front door behind him, preventing Mr. Hairston from filming the defendant officers' misconduct."  (Am. Compl. at ¶ 56, 60, ECF No. 3).

In arguing that no constitutional violation occurred, Defendants argue only that the deputies "never seized" the Hairstons during the knock-and-talk or "by ordering them inside incident to Tartt's arrest . . . ."  (See Mem. Supp. Summ. J. at 11-13, ECF No. 47).

The court disagrees.  While there was initially no seizure during the knock-and-talk, that changed when the officers

33

decided to arrest Mr. Tartt, ordered the Hairstons into their home, and nudged Mr. Hairston inside. At this point, the Hairstons were seized.

"A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen." Graham v. Connor, 490 U.S. 386, 395 n. 10 (1989)). Under this standard, federal courts have found that an individual may be seized when ordered into a home. See, e.g., Duran v. Sirgedas, 240 F. App'x 104, 110-11 (7th Cir. 2007); Croal v. United Healthcare of Wisconsin, Inc., No. 07-CV-837 2009 WL 913641, at *16 (E.D. Wis. Mar. 31, 2009) (citing Duran, 240 F. App'x at 104).

In this case, the officers ordered the Hairstons inside, entered their front porch, and pushed Mr. Hairston inside while they arrested the Hairston's landlord on the front porch. Because of this physical force and show of authority, their liberties were, "in some way restrained." Therefore, the court rejects defendants' argument that the Hairstons were not seized under the Fourth Amendment. The court will now turn to defendants' argument that this seizure did not violate clearly established law.

### (b). Clearly Established

Defendants argue that "it was not established law that Deputy Martin could 'seize' the Hairstons by ordering them inside incident to a lawful arrest." (Mem. Supp. Summ. J. at 12, ECF No 47).  This analysis is not as straightforward as defendants would have it, given that it is highly contested whether Mr. Tartt's arrest was "lawful."

Nonetheless, the Supreme Court has emphasized that "the risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." Michigan v. Summers, 452 U.S. 692, 702-03 (1981). Under this rationale, officers are given wide latitude to avoid increased risk to themselves and bystanders.  For example, courts have found it reasonable for officers to order persons inside where "extra people outside constituted an increased risk of an incident occurring." Croal, No. 07-CV-837, 2009 WL 913641, at *16 (citing Duran, 240 F. App'x at 104).

In this case, notwithstanding the arguably unlawful arrest of Mr. Tartt, the deputies did not violate clearly established law by ordering the Hairstons inside.  When the Hairstons were ordered inside, the situation was quickly escalating, and matters could have been much worse had they remained on the porch in close proximity to the arrest.  The Hairstons were permitted back onto the porch without interference after the

arrest.  Given the wide latitude officers are afforded to minimize additional risk to themselves and bystanders, this brief seizure did not violate clearly established law.

Defendants' motion for summary judgment is **GRANTED** as to the Hairstons' Fourth Amendment claims.

**B.  First Amendment Retaliation Claims**

The Hairstons and Mr. Tartt also assert First Amendment retaliation claims under § 1983 against Deputies Martin and Horn.  Plaintiffs claim that their seizures were "motivated by retaliatory animus, [and] directly harmed each of the plaintiffs by chilling their ability to exercise their First Amendment rights . . . ."  (Am. Compl. at ¶ 76, ECF No. 3).  Notably, the deputies do not claim qualified immunity from these § 1983 claims.  Rather, they argue that the claims fail "as a matter of law[.]"  (See Mem. Supp. Summ. J. at 14-16, ECF No. 47).  Thus, the only question is whether a genuine issue of material fact exists as to whether the deputies violated plaintiffs' First Amendment rights.[1]

---

[1] In their reply brief, defendants attempt—for the first time—to raise the defense of qualified immunity to the First Amendment claims.  (See ECF No. 51 at 13).  In doing so, they affirmatively state that "[i]n the *Motion for Summary Judgment*, the Deputies argued they were entitled to qualified immunity from Plaintiffs' First Amendment claims."  (Id).  However, in their opening brief addressing the First Amendment claims, defendants make no mention of qualified immunity, address neither prong of the inquiry, and instead only argue that the claims fail "as a matter of law."  (See id. at 14-16).  To now

"'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." Nieves v. Bartlett, 139 S.Ct. 1715, 1722 (2019) (quoting Hartman v. Moore, 547 U.S. 250, 256 (2006)).  To prove a First Amendment retaliation claim, a plaintiff must show that (1) "that [plaintiff's] speech was protected"; (2) "defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech"; and (3) "a casual relationship exists between [plaintiff's] speech and the defendant's retaliatory action." Tobey v. Jones, 706 F.3d 379, 387 (4th Cir. 2013) (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000)).

### 1.  The Hairstons' Claims

The court begins with the Hairstons' retaliation claims. They allege various retaliatory actions taken against them, including being subjected to prolonged questioning, accused of committing a crime, and ordered inside their home.  (See Am.

---

assert that they raised qualified immunity is not accurate; the argument was raised for the first time in the reply brief. Therefore, the court will not consider it:  "Inasmuch as this contention was raised for the first time in the Defendants' reply brief, it will not be considered."  Shuff v. Bank of Am., N.A., No. 5:20-cv-00184, 2021 WL 219105, at *4 n.3 (S.D.W. Va. Jan. 21, 2021) (Volk, J.) (citing Moseley v. Banker, 550 F.3d 312, 325 n.7 (4th Cir. 2008)).

Compl. at ¶ 68, ECF No. 3).  Defendants concede that "the
Hairstons' statements to the Deputies during their interaction
was protected speech."  (Mem. Supp. Summ. J. at 16, ECF No. 47).
Even so, they argue that there was no adverse action against the
Hairstons "[t]hroughout the entirety of the exchange" because
the deputies took no affirmative action until they arrested Mr.
Tartt. (Id.).  They contend that when the deputies arrested Mr.
Tartt, they ordered the Hairstons "inside their home to
effectuate the arrest of Tartt, not because of their criticism .
. . ."  (Id.).

    Regarding defendants' first argument, that no adverse
action occurred during the exchange before Mr. Tartt's arrest,
the court agrees.  As discussed above, the encounter started off
as a knock-and-talk until the officers decided to arrest Mr.
Tartt.  There was no adverse action taken up to that point.

    While that argument challenges the adverse action element,
defendants' second argument, that the deputies did not order the
Hairstons into their home because of their speech, challenges
the causation element.  To show causation, plaintiffs must
demonstrate that their "protected conduct was a substantial or
motivating factor in [the deputies'] decision to take adverse
action."  Martin v. Duffy, 977 F.3d 294, 300 (4th Cir. 2020).
If plaintiffs make that showing, the burden shifts to defendants
to establish "a permissible basis for taking that action."  Id.

In that case, defendants must show by a preponderance of the evidence that they "would have reached the same decision . . . in the absence of the protected conduct." Id. at 299 (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283 (1977)).  "If [defendants] fail[] to carry that burden, the inference is that but for causation . . . has been shown: the plaintiff would not have been harmed had his rights not been violated by the defendant."  Id. at 299.

This burden shifting framework presents disputed issues of fact.  On one hand, a jury could find that the deputies ordered the Hairstons into their home solely for safety reasons and that their speech played no part leading up to the adverse action. On the other hand, a jury could reasonably find that the Hairstons' speech was a substantial or motivating factor in the chain of events that led to Mr. Tartt's arrest and them being ordered into their home.  Indeed, the body camera footage shows that Deputy Martin became particularly argumentative on two occasions:  first when Ms. Hairston referred to "the season we are living in" after the George Floyd incident and second after she expressed that the deputies scared her by implying that she grew marijuana.

However, these disputed facts are not material.  None of the adverse actions alleged by the Hairstons rise to the level of a constitutional violation.  "A plaintiff asserting adverse

action must show more than 'de minimis inconvenience.'"
Bhattacharya v. Murray, 93 F.4th 675, 689 (4th Cir. 2024)
(citing Constantine v. Rectors & Visitors of George Mason Univ.,
411 F.3d 474, 500 (4th Cir. 2005)).  This requires a plaintiff
to allege an action that "may tend to chill individuals'
exercise of constitutional rights."  Id.

The deputies' interference with the Hairstons' speech was
de minimis.  By the Hairstons' own admission, they were not
initially targeted in the investigation because of their speech;
Deputy Martin accused them of growing marijuana before having
any other conversation with them.  They were then able to
exercise their speech rights throughout the encounter and were
only briefly ordered into their home while Mr. Tartt was
arrested.  They were then permitted to return to the porch,
where they continued to exercise free speech.  The deputies'
actions did not violate the Hairstons' First Amendment rights.

Therefore, defendants' motion for summary judgment is
**GRANTED** as to these claims.

### 2.  Mr. Tartt's Claims

As to Mr. Tartt's First Amendment retaliation claim against
the deputies, he claims that the officers subjected him to First
Amendment retaliation by "[r]epeatedly asking [him] for his
name, despite already knowing his name, for the purposes of
intimidating him and setting up a false arrest for

obstruction[,]" and "[r]epeatedly asking [him] for his date of birth, for the purposes of intimidating him, scaring him, invading his privacy, and setting up a false arrest for obstruction[.]"  (See Am. Compl. at ¶ 68, ECF No. 3).

Defendants argue that this claim fails on the causation element "because a magistrate found probable cause for his obstruction charge."  (See Mem. Supp. Summ. J. at 15, ECF No. 47).  Defendants also make the baseless argument that "Tartt's retaliation claim against Deputy Horn fails as a matter of law because Deputy Horn did not arrest Tartt."  (Id.).

The court has already rejected these arguments, as previously discussed at length.  The magistrate's finding of probable cause means nothing because it was based on material misstatements and omissions of fact in Deputy Martin's affidavit.  The argument that Deputy Horn did not arrest Mr. Tartt ignores the indisputable body-camera footage of Deputy Horn handcuffing Mr. Tartt, walking him to the police car, and otherwise acting in concert with Deputy Martin during the encounter.

A reasonable jury could find that the deputies questioned and arrested Mr. Tartt simply because he came to Ms. Hairston's defense when the deputies provoked arguments with her.  There is no question that an arrest is an adverse action:  "Some adverse actions may be easy to identify—an arrest, a prosecution, or a

dismissal from governmental employment." Houston Cmty. Coll.
Sys. v. Wilson, 595 U.S. 468, 477 (2022) (citing Nieves, 139
S.Ct. at 1722).

For these reasons, defendants' arguments do not entitle the
deputies to summary judgment on Mr. Tartt's First Amendment
retaliation claims. Defendants' motion for summary judgment is
**DENIED** as to these claims.

## C.  § 1985 Conspiracy Claims

Plaintiffs claim that "Defendants Martin and Horn,
conspired for the purpose of depriving, either directly or
indirectly, the plaintiffs of the equal protection of the laws
of the United States and/or of the equal privileges and
immunities under the laws of the United States." (Am. Compl. at
¶ 79, ECF No. 3).  As part of this alleged conspiracy, they
allege that they were deprived of their constitutional rights
because of their race:

> Plaintiffs are each African American[].
> They were targeted as suspects in the
> defendant officers' marijuana plant
> investigation just by virtue of their being
> African American.  Due to the color of
> plaintiffs' skin, the defendant officers
> engaged in the outrageous behavior of
> violating their privacy, private property
> rights, engaging in harassment . . . despite
> the fact that they had no information
> indicating they had violated any law . . . .

(Id. at ¶ 80).  They seek redress for the alleged deprivations
under 42 U.S.C. § 1985(3).

42

To prove a claim under that statute, plaintiffs must
establish five elements:

> (1) a conspiracy of two or more persons, (2)
> who are motivated by a specific class-based,
> invidiously discriminatory animus to (3)
> deprive the plaintiff of the equal enjoyment
> of rights secured by the law to all, (4) and
> which results in injury to the plaintiff as
> (5) a consequence of an overt act committed
> by the defendants in connection with the
> conspiracy.

Strickland v. United States, 32 F.4th 311, 360 (4th Cir. 2022)

(quoting Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995)).

Defendants, however, challenge only the first of the five

elements:  the existence of a conspiracy.  Therefore, the court

does not consider whether plaintiffs can or cannot establish the

other four elements, because "it is not the responsibility of

the Court to ferret out, from a brief, the legal contentions of

the moving party and then to find legal and evidentiary support

for them.  Likewise, it is not the responsibility of the

nonmoving party to engage in a similar exercise in rebutting a

motion for summary judgment."  Brown v. Mitchell, 327 F. Supp.

2d 615, 638 (E.D. Va. 2004).

As to the challenged element, defendants again assert,

based on a misstatement of indisputable fact, that Deputy Martin

alone "took [Mr. Tartt] into custody."  (Mem. Supp. Summ. J. at

17, ECF No. 47).  They, therefore, contend that "there was no

common plan or meeting of the minds between the Deputies when

arresting Tartt because Deputy Martin acted alone."  (Id. at
18).  The court again rejects this baseless argument.

To the contrary, plaintiffs argue that there is
circumstantial evidence that the deputies "acted in concert to
deprive plaintiffs of equal protection under the law."  (Pls'
Resp. at 17, ECF No. 50).  This circumstantial evidence, they
argue, is that the deputies responded to the "black camp" and
then acted together to "confront[] and accost[]" the residents
there:

> While the defendants obviously did not
> admit to the existence of such a conspiracy,
> it was revealed that the defendants were
> sent to investigate allegations of the smell
> of marijuana at 'the black camp,' referring
> to the two residences owned by Jason Tartt,
> one of which was occupied by the Hairstons,
> and one of which was occupied by an elderly
> African American man. . . .  A white woman
> texted now-Sheriff Muncy that a marijuana
> smell was coming from "the black camp," and
> he sent [two] white deputies to "the black
> camp," where they immediately confronted and
> accosted the Plaintiffs . . . .

(Id.).

The court agrees; this circumstantial evidence presents a
genuine issue of material fact for trial as to the conspiracy
element.  It is an "established principle of a civil rights
conspiracy that plaintiffs 'need not produce direct evidence of
a meeting of the minds,' but can 'come forward with specific
circumstantial evidence that each member of the alleged

conspiracy shared the same conspiratorial objective.'" <u>Frazier v. Cook</u>, No. 4:17-cv-54, 2017 WL 5560864, at *6 (E.D. Va. Nov. 17, 2017) (quoting <u>Hinkle v. City of Clarksburg</u>, 81 F.3d 416, 421 (4th Cir. 1996)).  Because inferences necessarily require weighing evidence, "[w]hether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached a[n] understanding to achieve the conspiracy's objectives." <u>S.V. by and through Valencia v. Delano Union Elementary Sch. Dist.</u>, No. 1:17-cv-00780-LJO-JLT, 2017 WL 3479009, at *3 (E.D. Cal. Aug. 14, 2017) (quoting <u>Mendocino Envtl. Ctr. v. Mendocino Cty.</u>, 192 F.3d 1283, 1301-02 (9th Cir. 1999)).

For this reason, summary judgment is not appropriate to resolve the "conspiracy" element of plaintiffs' § 1985 claims, and defendants' motion for summary judgment is **DENIED** as to these claims.

## D. Supervisory Liability § 1983 Claims

Plaintiffs assert supervisory liability claims against Chief Deputy Muncy, the deputies' supervisor, for the deputies' alleged constitutional violations.  Plaintiffs allege that Chief Deputy Muncy "had notice of a pattern of unconstitutional acts by his subordinates . . . [,]" "was deliberately indifferent in

failing to train and/or supervise employees . . . [,] and "[a]s
a direct result, the Plaintiffs were injured." (Am. Compl. at
¶¶ 96, 98-99, ECF No. 3). Plaintiffs also allege that "[u]pon
information and belief, there are multiple prior similar
incidents of [McDowell County] deputies engaging in similar
constitutional violations." (Id. at ¶ 89).

While § 1983 claims against supervisors are termed
"supervisory liability" claims, that term is a misnomer. See
King v. Riley, 76 F.4th 259, 269 (4th Cir. 2023). Such
liability is not premised upon respondeat superior but upon "a
recognition that supervisory indifference or tacit authorization
of subordinates' misconduct may be a causative factor in the
constitutional injuries they inflict on those committed to their
care." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994)
(quoting Slakan v. Porter, 737 F.2d 368, 372-73 (4th Cir.
1984)).

In other words, a supervisor is liable only for his own
misconduct, but he may commit misconduct if: (1) the supervisor
knew of the subordinates' misconduct and its pervasive and
unreasonable risk of constitutional injury, (2) the supervisor's
response to that knowledge demonstrates deliberate indifference
to the risk of constitutional injury or a tacit authorization of
the conduct, and (3) there is an "affirmative causal link"
between the supervisor's inaction and the plaintiff's

constitutional injury.  See Timpson v. Anderson Cty.
Disabilities and Special Needs Bd., 31 F.4th 238, 257 (4th Cir.
2022) (citing Stroud, 13 F.3d at 799).

   Chief Deputy Muncy argues that he is entitled to summary
judgment on this claim because "Plaintiff[s] have not developed
any evidence demonstrating that [Chief Deputy Muncy] had actual
or constructive notice of any alleged constitutional violations
by the Deputies."  (Mem. Supp. Summ. J. at 18, ECF No. 47).  The
court agrees.

   While plaintiffs allege in their complaint that other
deputies of the McDowell County Sheriff's Department had engaged
in similar alleged misconduct before, and that the county had
notice of it, plaintiffs offer no such evidence.  Likewise, they
offer no evidence that Chief Deputy Muncy knew of these
deputies' conduct before it happened or as it transpired.
Therefore, plaintiffs cannot prove that Chief Deputy Muncy was
deliberately indifferent to the conduct or tacitly authorized
it.  Although plaintiffs argue that he approved the conduct
after the fact when he testified that the deputies did nothing
wrong, (see Pls.' Resp. at 19, ECF No. 50), there is not an
"affirmative causal link" between that after-the-fact approval
and plaintiffs' alleged injuries.

   Therefore, defendants' motion for summary judgment is
**GRANTED** as to these claims.

## E. __Monell__ Claims

Finally, the court turns to plaintiffs' § 1983 claims
brought against the McDowell County Commission under Monell v.
Department of Social Services of City of New York, 436 U.S. 658
(1978).  A § 1983 claim brought pursuant to Monell "permits
suits against a municipality for a federal constitutional
deprivation only when the municipality undertook the allegedly
unconstitutional action pursuant to an 'official policy' or
'custom.'"  Starbuck v. Williamsburg James Cty. Sch. Bd., 28
F.4th 529, 533 (4th Cir. 2022) (quoting id. at 690-91).  A
county commission is considered a municipality for purposes of §
1983 claims.  See Revene v. Charles Cty. Comm'rs, 882 F.2d 870,
874 (4th Cir. 1989).  "The Fourth Circuit has recognized that
'in the realm of county law enforcement,' it is the 'sheriff
[who] is the duly delegated policy maker for the county.'"  Frye
v. Lincoln Cty. Comm'n, No. 2:20-cv-00403, 2021 WL 243864, at *4
(S.D.W. Va. Jan. 25, 2021) (quoting id. at 874).  Plaintiffs can
prove a policy or custom of the McDowell County Commission in
four ways:

> (1) through an express policy, such as a
> written ordinance or regulation; (2) through
> the decisions of a person with final
> policymaking authority; (3) through an
> omission, such as a failure to properly
> train officers, that 'manifest[s] deliberate
> indifference to the rights of citizens'; or
> (4) through a practice that is so

> 'persistent and widespread' as to constitute
> a 'custom or usage with the force of law.'

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003).

In this case, the court found in a prior order that plaintiffs failed to adequately allege the existence of a written policy or custom of the McDowell County Commission. (See Order at 10, ECF No. 38).  Plaintiffs instead attempt to prove "custom by condonation," arguing that defendants acted according to "a grossly unconstitutional policy and practice" because Chief Deputy Muncy testified in his deposition that Deputies Martin and Horn acted within department policy, and that Chief Deputy Muncy has done nothing to rectify the conduct. (See Pls.' Resp. at 20, ECF No. 50).

Plaintiffs have put forth no evidence of a policy or custom to meet the heavy burden of proof for their Monell claims. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  Craven v. Novelli, 661 F. Supp. 3d 430, 450 (W.D.N.C. 2023) (quoting Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 405 (1997)).

Although plaintiffs allege that the supervisors at the Sheriff's Department knew of these events as they transpired and

49

condoned them, plaintiffs have offered no evidence to support that allegation.  They have also offered no evidence that the deputies were trained in these allegedly unconstitutional practices.  It is not enough that Chief Deputy Muncy defended the actions of his subordinates during this litigation: "[M]erely 'going along with the discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy.'" Lytle, 326 F.3d at 472.

Defendants' motion for summary judgment is **GRANTED** as to plaintiffs' Monell claims.

### IV.  Conclusion

For the above reasons, defendants' amended motion for summary judgment (ECF No. 46) is **GRANTED** in part as to the Hairstons' Fourth Amendment claims, the Hairston's First Amendment claims, plaintiffs' supervisory liability claims against Chief Deputy Muncy, and plaintiffs' Monell claims against the McDowell County Commission.  The motion is **DENIED** in part as to Mr. Tartt's Fourth Amendment claims, Mr. Tartt's First Amendment claims, and plaintiffs' § 1985 civil-rights-conspiracy claims.  Defendants James "Boomer" Muncy and the McDowell County Commission are **DISMISSED** from the action.  Defendants' original motion for summary judgment (ECF No. 45) is also **DENIED** as **MOOT.**

The Clerk is directed to send a copy of this Memorandum
Opinion and Order to counsel of record.

**IT IS SO ORDERED** this 25th day of June, 2024.

ENTER:

David A. Faber
Senior United States District Judge